# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                             No. CR 19-3611 JB

BOBBY PENA,

     Defendant.

## <u>MEMORANDUM ORDER AND OPINION</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence, filed August 6, 2021 (Doc. 29)("Motion to Suppress").  The Court held an evidentiary hearing on October 7, 2021.  <u>See</u> Clerk's Minutes at 1, filed October 7, 2021 (Doc. 53).  The primary issues are: (i) whether the Second Search Warrant, Search and Seizure Warrant at 1 (dated January 5, 2018), filed August 6, 2021 (Doc. 29-1)("Second Search Warrant") lacked probable cause to believe that Federal Bureau of Investigation ("FBI") Special Agent Matthew A. Kucenski would find evidence of child pornography on Defendant Bobby Pena's devices, because Kucenski stated that he believed pornography, rather than child pornography, would be found on the devices, and whether the Kucenski Aff., Affidavit, filed August 6, 2021 (Doc. 29-1)("Kucenski Aff."), in support of the Second Search Warrant is otherwise devoid of sufficient detail; (ii) if probable cause does not support the Second Search Warrant, whether Kucenski relied on the warrant in good faith; and (iii) if probable cause does not support the search warrant, whether Kucenski inevitably would have discovered the child pornography in the course of the fraud investigation that prompted the First Search Warrant, Application for a Search Warrant ¶ 11, at 3 (dated December 12, 2017), filed August 6, 2021 (Doc. 29-3)("First Search Warrant").  The Court concludes that: (i) the Kucenski

Aff. provides sufficient factual detail in support of the search warrant, and, within the totality of the circumstances, the file folder names, Pena's use of peer-to-peer software, and the large number of devices indicating collector behavior, support sufficiently the probable cause determination of Magistrate Judge Jerry H. Ritter, United States Magistrate Judge for the United States District Court for the District of New Mexico; (ii) even if the search warrant lacks probable cause, Kucenski relied on Magistrate Judge Ritter's probable cause determination in good faith when he executed the search warrant and searched Pena's devices for child pornography evidence; and (iii) even if the search warrant lacks probable cause, Kucenski inevitably would have discovered more incriminating file folder names that would have supported the search warrant's issuance.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). "[H]earsay testimony is admissible at

suppression hearings . . . and should be considered by a district court[.]" <u>United States v. Miramonted</u>, 365 F.3d 902, 904 (10th Cir. 2004)(citing <u>United States v. Matlock</u>, 415 U.S. 164, 173 (1974)).[1]

---

[1]In <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), the Supreme Court held that the introduction of testimonial hearsay statements from witnesses not subjected to cross examination at trial violates a defendant's Sixth Amendment confrontation right. <u>See</u> 541 U.S. at 68-69. There is no binding precedent from the Supreme Court or the United States Court of Appeals for the Tenth Circuit concerning whether <u>Crawford v. Washington</u> applies to pretrial suppression hearings. The Tenth Circuit has indicated in unpublished caselaw that <u>Crawford v. Washington</u> does not bar hearsay statements at a suppression hearing. In <u>United States v. Ramirez</u>, the Tenth Circuit notes:

> It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings. <u>See</u> <u>United States v. Garcia</u>, 324 Fed. App'x. 705, 708 (10th Cir. [2009]), <u>cert. denied</u>, [558] U.S. [890] . . . (2009)(collecting cases). Nonetheless, even if we assume that the Confrontation Clause applies to the hearings at issue here, the admission of the confidential informant's statements was harmless.

388 F. App'x 807, 810 (10th Cir. 2010)(unpublished). Moreover, based on the same reasoning as the Tenth Circuit in <u>United States v. Ramirez</u>, 388 F. App'x 807 (10th Cir. 2010)(unpublished), the Court has concluded that hearsay statements are admissible in a detention hearing. <u>See</u> <u>United States v. Hernandez</u>, 778 F. Supp. 2d 1211, 1227 (D.N.M. 2011)(Browning, J.)(" Before <u>Crawford v. Washington</u>, courts held that the Confrontation Clause did not attach to detention hearings. Nothing in the Supreme Court's opinion in <u>Crawford v. Washington</u> undermines those holdings. Moreover, what authority exists after <u>Crawford v. Washington</u> rejects the proposition that <u>Crawford v. Washington</u> applies outside of trial."). Moreover, other Circuit Courts that have addressed this question have held that hearsay evidence's introduction at pre-trial proceedings does not violate the Confrontation Clause. <u>See</u> <u>Peterson v. California</u>, 604 F.3d 1166 (9th Cir. 2010)(concluding that the admission of hearsay evidence at a preliminary hearing does not violate the Confrontation Clause because the right to confrontation is a trial right). <u>See also</u> <u>United States v. Mitchell-Hunter</u>, 664 F.3d 45, 52 (1st Cir. 2011)(holding that the defendant did not have a confrontation right in a pretrial jurisdictional hearing). Consequently, the Court concludes that the admission of hearsay testimony at the suppression hearing does not violate Pena's confrontation rights.

1.      **Fraud Investigation**.

1.      Pena worked as a subcontractor to Sandia National Laboratories ("Sandia Labs") from May, 2008, to June, 2017.  See United States' Response in Opposition to Defendant's Motion to Suppress Evidence (Doc. 29) at 1, filed August 20, 2021 (Doc. 32)("Response").

2.      Doing business as De La Pena LLC, Pena provided specialized cleaning services, including air particle count monitoring, to Sandia Labs.  See Response at 1; Motion to Suppress at 6.

3.      In June, 2016, Sandia Labs contacted the Department of Energy's ("DOE") Office of Inspector General ("IG") to "report that [De La Pena, LLC] was submitting claims for work that was not performed."  First Search Warrant ¶ 11, at 3.

4.      "Specifically, based on Sandia [Labs] badge swipe records and other inquiries conducted by Sandia, [De La Pena, LLC] was not performing the required cleaning duties listed in the contract to include air particle count monitoring."  First Search Warrant ¶ 11, at 3.

5.      The DOE IG conducted surveillance on Pena and determined that he was not monitoring the air particle count but nonetheless was reporting air particle count data to Sandia Labs.  See First Search Warrant ¶¶ 12-16, at 4.

6.      On July 14, 2017, DOE IG Special Agents interviewed Pena.  See First Search Warrant ¶ 18, at 5.

7.      During the July 14, 2017, interview, Pena admitted that "he did not conduct required air particle count monitoring's [sic] and falsified the test results . . . for approximately two years."  First Search Warrant ¶ 18, at 5.

8.      Pena admitted to using his personal laptop to falsify the air count particle data that he submitted to Sandia Labs.  See First Search Warrant ¶¶ 18-19, at 5.

9.      Based on their surveillance and interview of Pena, on December 12, 2017, DOE Special Agent Louis Gomez applied for a search warrant to search and seize Pena's electronic devices located "within the Extra Space Storage Office building," which is where Pena's office was located.  First Search Warrant ¶¶ 2, 20, at 2, 5.

10.      The First Search Warrant's purpose was to determine whether the equipment "was used to generate, store, and submit false, fictitious or fraudulent claims."  First Search Warrant ¶ 20(c), at 5.

11.      Specifically, the First Search Warrant authorized law enforcement to search and seize:

> 1.      All electronic records relating to violations of 18 U.S.C. § 287 involving DE LA PENA, LLC or BOBBY MARTIN PENA including:
>
>> a)   Data related to Sandia National Laboratories (Sandia) contracted work
>>
>> b)   Data related to air particle monitoring data at Sandia
>>
>> c)   Invoices to Sandia
>>
>> d)   Time records
>>
>> e)   Sandia cleanroom floorplans
>>
>> f)   Dates and times of work performed at Sandia
>>
>> g)   Emails related to Sandia

and,

> 3.      For any computer hard drive or other [electronic] media that is called for by this warrant, or that might contain things otherwise called for by this warrant:
>
>> a)   Evidence of user attribution showing who used or owned the media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history;

    b)  Passwords, encryption keys, and other access devices that may be necessary to access the media;

    c)  Documentation and manuals that may be necessary to access the media or to conduct a forensic examination of the media.

First Search Warrant ¶¶ 1, 3, at 11.

12.    On December 12, 2017, the Honorable Steven C. Yarbrough, United States Magistrate Judge for the United States District Court for the District of New Mexico, issued the First Search Warrant with instructions to law enforcement to execute the search warrant before December 26, 2017.  See First Search Warrant at 12.

**2.**    **Search of Pena's Electronic Devices.**

13.    On December 13, 2017, law enforcement officers executed the First Search Warrant at Pena's office.  See Kucenski Aff. ¶ 37, at 17.

14.    During the First Search Warrant's execution, officers asked Pena about the electronic devices' contents.  Kucenski Aff. ¶ 38, at 16.

15.    Pena told officers that the devices contain "family photos" and "porn."  Kucenski Aff. ¶ 38, at 16.

16.    Officers asked Pena if the devices contain any child pornography, and he responded, "No," and informed officers that he "rips"[2] pornography from "torrent" files.  Kucenski Aff. ¶ 38, at 16.

---

[2]In this context, the Court concludes that "rips" refers to "extracting all or parts of digital contents from a container. . . .  Ripping is often used to shift formats, and to edit, duplicate, or back up media content."  See Ripping, Wikipedia, https://en.wikipedia.org/wiki/Ripping (last visited November 9, 2021).

17.     "Torrent files" are files shared from Internet "peer-to-peer" ("P2P") file sharing software.  Kucenski Aff. ¶ 38, at 16.

> P2P file sharing networks, including the BitTorrent network, are frequently used to trade digital files of child pornography. These files include both image and video files. Users of the BitTorrent network wishing to share new content will use a BitTorrent program to create a "torrent" file for the file or grout of files they wish to share. A torrent file is a small file that contains information about the file(s) and provides a method for a user to download the file(s) referenced in the torrent from other BitTorrent users. Torrent files are typically found as the result of keyword searches on Internet sites that host or link to them.

Kucenski Aff. ¶ 10, at 10-11.

18.     On December 14, 2017, Kucenski observed files and folders on Pena's devices with titles such as "'HotYoungDoll' (sic), 'HotYoungThing' (sic), 'hotyoungthing-nude_xvid.avi' (sic), 'Casting Couch Teens Site Rip', 'Teens Do Porn SiteRip', 'teensx' (sic), 'DblTemedTens' (sic), 'Teens Obedience Lesson Site Rip', and 'Teen Sex Mania SiteRip' (sic)."  Kucenski Aff., at 16-17 (alteration in Kucenski Aff.).

19.     Kucenski attested that he "documented the findings, but did not open any of the files, nor view the actual content."  Kucenski Aff. ¶ 40, at 17.

20.     Kucenski attests in his Affidavit that those who distribute, possess, or produce child pornography exhibit "collector behavior."  Kucenski Aff. ¶ 24, at 14.

21.     Kucenski further attests that Pena "may fall within this [collector behavior] in light of indicators of large quantities of suspected pornographic materials on ten, large-capacity, USB storage devices."  Kucenski Aff. ¶ 24, at 14.

22.     Kucenski also attests that

[s]ome of the characteristics of "collector behavior" include:

a.      Persons who are "collectors" of child pornography often keep the material in their possession for years, because it is considered valuable contraband.

b.      Persons who are "collectors" of child pornography often transfer electronic files containing child pornography from device to device, either to make room on their devices, or for long-term storage.

Kucenski Aff. ¶ 24, at 14.

23.      Kucenski applied for the Second Search Warrant on January 5, 2018.  See Second Search Warrant at 1.

24.      Magistrate Judge Ritter issued the Second Search Warrant on January 5, 2018.  See Second Search Warrant at 1.

25.      The Second Search Warrant allowed Kucenski to search:

1.      Dell laptop computer (S/N: 58YRPC2)

2.      Western Digital external hard drive (S/N: WXC1E32ASTL9)

3.      Seagate external hard drive (S/N: NA7P8TBM)

4.      Seagate external hard drive (S/N: NA5JOG29)

5.      Seagate external hard drive (S/N: NA7EG5TZ)

6.      Seagate external hard drive (S/N: NA8F2B19)

7.      Simple Tech external hard drive, ("BOM No: 96300-41001-013")

8.      Toshiba external hard drive (S/N: 54LCTMEBT18B)

9.      Western Digital external hard drive (S/N: WXGOAC927763)

10.     Verbatim thumb drive (black in color)

11.     Verbatim thumb drive (red in color)

Second Search Warrant at 3.

26.     The Second Search Warrant authorized Kucenski's search of Pena's devices for child pornography, defined as the

> visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct, as well as any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct.

Kucenski Aff. ¶ 4(a), at 8-9.

27.     Between January 9, 2018, and January 24, 2019, Kucenski conducted a forensic analysis on Pena's devices, which

> revealed more than 8 million images and video files present on the devices analyzed; however, only 300,000 images and video files were reviewed to date (3.75%). Of the images and videos reviewed, approximately 1% were potentially illegal materials; 22% were images and videos of children that were not sexually explicit, but sexual in nature; and 36% were adult pornography.

Digital Forensic Analysis Report at 7, filed August 6, 2021 (Doc. 29-4)("Forensic Report").

28.     Specifically, the forensic analysis found fifty-eight videos of suspected child pornography, 3,972 unique images of suspected child pornography, thirty-nine videos of suspected child exploitation materials, and 63,841 images of suspected child exploitation materials.  See Forensic Report at 7.

## **PROCEDURAL BACKGROUND**

On October 9, 2019, a federal Grand Jury returned an indictment charging Pena with possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256. See Indictment, filed October 9, 2019 (Doc. 2).  Pena was arraigned on October 23, 2019.  See

Clerk's Minutes at 1, filed October 23, 2019 (Doc. 9).  On August 6, 2021, Pena filed a Motion to Suppress Evidence.  See Motion to Suppress at 1.

1.      **Motion to Suppress.**

In his Motion to Suppress, Pena first argues that the Second Search Warrant does not demonstrate probable cause that evidence of child pornography would be found on Pena's electronic devices, because Kucenski's affidavit demonstrated only that he believed there would be evidence of pornography, not child pornography, on the devices.  See Motion to Suppress at 12. Second, Pena argues that the good-faith exception does not apply, because the warrant affidavit does not contain facts which provide a basis of knowledge for Kucenski to believe child pornography would be found on the devices, and Kucenski should have exercised his independent judgment and known that the warrant lacked probable cause.  See Motion to Suppress at 3-4.  Pena also argues that the fact that he is also charged with procurement fraud allegations mitigates the social costs of excluding the child pornography evidence.  See Motion to Suppress at 3-4.  Finally, Pena argues that the United States cannot establish that it would have inevitably discovered evidence of child pornography while examining the devices for evidence of procurement fraud, because the devices contained over eight million image and digital files, and the United States has reviewed approximately 3.75% of the image and video files, of which only 1.34% meet the definition of child pornography.  See Motion to Suppress at 4.

2.      **The Response.**

The United States responds.  See Response at 1.  First, the United States contends that, under the totality of the circumstances, Kucenski's affidavit articulates probable cause that Pena's devices contain child pornography.  See Response at 4.  The United States further argues that the good-faith doctrine applies here, because Kucenski was entitled to rely on Magistrate Judge

Ritter's probable cause determination and took the steps necessary to ensure that Pena's rights were not violated.  See Response at 4.  Finally, the United States contends that Kucenski inevitably would have discovered the evidence of child pornography, because he would have discovered more files in the course of his search for evidence of procurement fraud, and the First Search Warrant explicitly authorizes agents to search Pena's browsing history, which would have displayed terms related to child pornography.  See Response at 15.

### 3.    **The Reply**.

Pena replies to the United States' Response.  See Defendant's Reply in Support of His Motion to Suppress Evidence, filed September 3, 2021 (Doc. 42)("Reply").  In his Reply, Pena argues that the Second Search Warrant affidavit does not provide the necessary link to connect Pena's interest in "pornography" to "child pornography."  Reply at 1.  Pena further argues that Kucenski's affidavit states only that he believes the file folders contain pornography and not child pornography.  See Reply at 2.  Pena also contends that the United States mischaracterizes him as "equivocat[ing]" about possessing child pornography and argues that he expressly denied possessing child pornography.  Reply at 2.  Next, Pena contends that the fact that Kucenski sought a warrant does not overcome the warrant's lack of factual support to believe the devices contained child pornography.  See Reply at 2.  Finally, Pena argues that Kucenski would not inevitably discover evidence of child pornography, because there was a low probability that the United States would have discovered child pornography by clicking randomly on images or videos given the large volume of data.  See Reply at 3.

### 4.    **The Hearing**.

The Court held a hearing on October 7, 2021.  See Clerk's Minutes at 1.  The hearing began with the United States calling Special Agent Matthew Kucenski as a witness.  See Draft Transcript

of October 7, 2021, Hearing at 2:16-17 (Taken Oct. 7, 2021)(Mease)("Tr. at").[3]  Kucenski first

testified about his background and experience in computer forensics.  See Tr. at 5:3-10:8 (Mease,

Kucenski).  The United States then moved to have Kucenski certified as an expert in computer

forensics, and the Court agreed to allow Kucenski to offer opinion testimony in that area.  See Tr.

at 9:24-10:14 (Mease, Court, Dodd).  Kucenski acknowledged that he was not present for the First

Search Warrant's execution, but that he conducted forensic analysis on the items law enforcement

seized in conjunction with the First Search Warrant.  See Tr. at 12:11-14 (Mease, Kucenski); id.

at 12:25-14:4 (Mease, Kucenski).  Kucenski testified that the First Search Warrant did not limit

the record search for evidence of fraud to any specific file types.  See Tr. at 14:5-14 (Mease,

Kucenski).  Kucenski explained that the officers who executed the search warrant gave him the

devices on which to conduct the computer forensic analysis, and, in doing so, the officers informed

Kucenski that "Mr. Pena explained that there were family photos and pornography.  They

explained as to me that they then asked is there any child pornography on the devices, and the

impression that I took from the answer was that he was a little bit evasive about that answer."  Tr.

at 19:14-19 (Kucenski).  Kucenski then explained that, when he is given an electronic device, his

first step is to make a copy of the devices on which to conduct his analysis.  See Tr. at 22:2-9

(Kucenski).  During the copying process, Kucenski explained, he will look at the files -- something

he refers to as a "high level look" -- to ensure the copying is actually happening.  Tr. at 22:11-16

(Kucenski).  He then does a second review, which he refers to as "walking the scene," where he

looks around the device to understand the file layout.  Tr. at 23:7-19 (Kucenski).  Kucenski stated

that he found file names indicating child pornography's presence during one of these two

---

[3]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

preliminary searches of the device. See Tr. at 23:7-19 (Kucenski). Kucenski did not open any of the files and stopped his search to obtain the Second Search Warrant. See Tr. at 24:6-14 (Kucenski). Kucenski acknowledged that he did not mention that he found child pornography in the Kucenski Aff. See Tr. at 25:10-15 (Mease, Kucenski). Kucenski then testified that he made the decision to seek the search warrant based also on Pena's statement about his device containing pornography, Pena's use of torrents, and the large number of devices and files. See Tr. at 25:16-28:16 (Mease, Kucenski). The large number of devices and files indicated child pornography, Kucenski stated, because: "My training has taught me that people who are involved in child pornography often keep, they collect it. They keep it. They move it from device to device to make room for other things, but they keep it. . . . So that factors into the volume of data that was there." Tr. at 27:22-28:4 (Kucenski). Kucenski testified that, after Magistrate Judge Ritter issued the Second Search Warrant, Kucenski expanded his search of Pena's devices to look for child pornography. See Tr. at 29:20-30:1 (Mease, Kucenski). Kucenski stated that he spent one year conducting forensic analysis on the devices and got through approximately three percent of the data contained on Pena's electronic devices. See Tr. at 30:2-17 (Mease, Kucenski). Further, Kucenski stated that the child pornography was not all in one place, but was mixed across the devices. See Tr. at 31:8-21 (Mease, Kucenski). The United States asked Kucenski if he believed that he would have come across the child pornography in the course of his forensic investigation in the fraud case, even without the Second Search Warrant; Kucenski responded: "Yes, I do think that that would have happened," Tr. at 32:10-20 (Mease, Kucenski), because, "[a]t least in a couple of cases, the files were found at a pretty high level in the directory structure [of] the device, so it was only a folder or two down where other key word[s] started coming out that would suggest that something may be there." Tr. at 32:22-33:1 (Kucenski).

On cross-examination Pena walked Kucenski through Kucenski's review process of the fraud investigation, including key word searches and documents.  See Tr. at 54:10-55:25 (Dodd, Kucenski).  Kucenski testified that the data on the electronic devices included "millions and millions and millions of files," Tr. at 59:1-4 (Dodd, Kucenski), and "there was so much data . . . that [he] had trouble importing it into the different software programs," Tr. at 59:5-7 (Dodd, Kucenski).  Further, Kucenski explained that he used different document analysis tools for the fraud investigation and the child pornography investigation.  See Tr. at 59:25-61:7 (Dodd, Kucenski).  Specifically, Kucenski described using Nuix[4] -- which allows the user to structure searches of documents -- for the fraud investigation, and Griffeye[5] -- which allows the user to search for nudity in images -- for the child pornography investigation.  See Tr. at 60:22-62:4 (Dodd, Kucenski).  Next, Kucenski acknowledged that most of the child pornography was found on hard drive 4 and hard drive 7, and that he did not search hard drives 4 and 7 in connection with the fraud investigation, because the high-level review of the two hard drives indicated that they contained "only pornography."   Tr. at 68:1-17 (Dodd, Kucenski).   Additionally, Kucenski acknowledged that in his affidavit, he wrote only "that the files and folders are named to suggest the content contained pornography," Tr. at 69:7-10 (Dodd, Kucenski), because he was "not sure whether it is child pornography or other pornography," Tr. at 69:11-13 (Dodd, Kucenski).

---

[4]Nuix is a company that "produces investigative analytics and intelligence software for extracting knowledge from unstructured data."   Nuix Ltd, Wikipedia, https://en.wikipedia.org/wiki/Nuix (last visited Nov. 6, 2021).

[5]"Griffeye Analyze is used by law enforcement across the world for processing, sorting and analyzing large volumes of images and videos -- with a focus on cases containing child sexual abuse material."  Griffeye, Griffeye, https://www.griffeye.com/ (last visited Nov. 6, 2021).

Next, Pena called Brian Chase as a witness.  See Tr. at 79: 6-7 (Dodd).  Pena moved to admit Chase as a digital forensics expert, and the Court allowed Chase to offer digital forensics opinion testimony.  See Tr. at 82:10-17 (Dodd, Court).  Chase testified that he spent twenty hours manually reviewing the data in this case and, in that time, "found very few images of child pornography" and found mostly adult pornography.  See Tr. at 84:16-19 (Chase).  Chase further testified that the files referenced in the affidavit for the Second Search Warrant contained only adult pornography, and the term "teen" often describes a person eighteen, nineteen, or even twenty years old.  See Tr. at 86:15-87:3 (Dodd, Chase).  On cross-examination, the United States asked: "[I]f an agent was just doing a general survey of the image files on the seized devices the same way that you were with using minimal search terms and just manually looking through the images he or she would eventually come across child pornography at some point?" Tr. at 95:24-96:4 (Mease); Chase responded: "I'm not sure I agree with that."  Tr. at 96:5 (Chase).  Chase clarified: "If you are looking through all of the images then eventually you would find one and given the amount of time but you'd have to be specifically clicking through images contained within folders that are clearly not related to any sort of procurement fraud."  Tr. at 96:11-16 (Chase).

The Court allowed the parties arguments on the Motion to Suppress.  See Tr. at 100:7-10 (Court).  Pena first argued that the Court must ascertain probable cause within the Second Search Warrant from the affidavit's four corners, because Kucenski did not testify in support of the warrant.  See Tr. at 101:1-21.  Second, Pena argued that the Second Search Warrant is based on the improper conclusion that "a person who uses peer to peer software and a person who collects pornography is likely to also possess and be interested in child pornography."  Tr. at 104:8-11 (Ward).  Third, Pena argued that the Second Search Warrant relies on boilerplate language rather

than factual support and that, consequently, the good-faith exception does not apply.  See Tr. at 106:7-107:5 (Ward).

The United States responded, contending that probable cause supports the Second Search Warrant, because of "file names indicative of pornography," Tr. at 119:5-6 (Mease), Pena not asserting that he did not have child pornography on his device, see Tr. at 119:11-13 (Mease), Pena's use of peer to peer software, see Tr. at 119:24 (Mease), and the large amount of devices and data being consistent with collector behavior, see Tr. at 120:11-13 (Mease).  Moreover, the United States argued that the case agent relied on the issuance of the Second Search Warrant in good faith.  See Tr. at 122:1-3 (Mease).  Finally, Pena argued that agents would not have discovered inevitably child pornography on Pena's devices, because they would not have spent a significant amount of time conducting forensic analysis on a fraud investigation, and because Pena had a large number of files with only a small percentage of child pornography.  See Tr. at 129:1-130:22 (Ward).

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is reasonableness."   United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).   "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions."  Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

1.       **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121.  The Supreme Court

has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"   Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).   See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."   At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the

scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations. See, e.g., United States v. Knights, 534 U.S. at 119-20 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."   Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the

privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

    **2.**    **Traffic Stops.**

    A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819, 823 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon-Quijada, 107 F.3d 786, 792 (10th Cir. 1997).  In Terry, the Supreme Court authorized police officers to conduct limited seizures and to search a person's outer clothing when the officer has reasonable suspicion that criminal activity may be afoot.  See Terry, 392 U.S. at 30-31.  The Tenth Circuit has concluded that traffic stops fall into the category of Terry stops.  See United States v. Toro-Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."); United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

    For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity."  United States v. Leos-Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity."  United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)).  Accord United

States v. Ramos, 194 F. Supp. 3d at 1156. Reasonable suspicion is not determined by any one

factor but by the totality of the circumstances that the officer knew. See United States v. Ceballos,

355 F. App'x 226, 229 (10th Cir. 2009)(unpublished)[6]; United State v. Elkins, 70 F.3d at 83 (citing

Alabama v. White, 496 U.S. 325, 330 (1990)). Even if the officer does not form subjective

reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop

reasonable suspicion, the stop is proper. See United States v. Ceballos, 355 F. App'x at 229

(holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop.

See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to

stop an automobile is reasonable where the police have probable cause to believe that a traffic

violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir.

2002)(acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient*

ground for a stop," but explaining that reasonable suspicion is all that is necessary (quoting United

States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)(emphasis in United States v. Ramstad

---

[6]United States v. Ceballos is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that United States v. Ceballos, United States v. King, United States v. Reed, and United States v. Kilgore have persuasive value with respect to a material issue and will assist the Court in its disposition of this Order.

and United States v. Callarman).  Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully stop a vehicle that he or she observes violating the traffic laws.  See Whren v. United States, 517 U.S. at 813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)(unpublished)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States, 517 U.S. at 813).  In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the officer also has a constitutional basis for executing the stop.  United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest")(quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns."  Rodriguez v. United States, 575 U.S. at 354. Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction.  Rodriguez v. United States, 1575 U.S. at 354.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense); United States v. Ramos, 194 F. Supp. 3d at 1157.  In short, absent reasonable

suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop."  Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway. See New York v. Class, 475 U.S. at 115 (concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop").  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations."  New York v. Class, 475 U.S. at 119.  See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike checking license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy. New York v. Class, 475 U.S. at 118.  Checking a vehicle's VIN therefore has a similarly close

connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Officers may also engage in routine questioning while conducting the traffic stop but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'"  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. at 327-28).  See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required").  Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  Rodriguez v. United States, 575 U.S. at 355.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation."  575 U.S. at 350-51 (alterations in original)(internal quotation marks and citation omitted).  There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents.  See 575 U.S. at 351-52.  After "the justification for the traffic stop was 'out of the way'" and without permission from the driver, the officer: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs.  575 U.S. at 352.  "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs."  575 U.S. at 352.  The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "de minimis intrusion

on Rodriguez's personal liberty." 575 U.S. at 353. The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed." Rodriguez v. United States, 575 U.S. at 354. See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")(alterations added).

### 3. **Vehicle Searches**.

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search."). Under the automobile-exception to the warrant requirement, however, a warrant is generally not required. See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)). The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle. See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985). Thus, as

long as the investigating officer has probable cause to believe that the vehicle contains contraband

or evidence of criminality, he or she may search the vehicle without a search warrant.  See United

States v. Sedillo, 2010 WL 965743, at *11.

### 4.  **Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth

Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte,

412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States

v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S.

at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which

requires that: (i) the government "'proffer clear and positive testimony that consent was

unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no

'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir.

2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be

determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.

The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that

courts should consider when trying to determine whether a defendant's consent was voluntarily

given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive
> language or tone of voice indicating that compliance with an officer's request is
> compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;"
> (iii) the "prolonged retention of a person's personal effects such as identification,"
> or, conversely, "the prompt return of the defendant's identification and papers;"
> (iv) the "absence of other members of the public," or, conversely, whether the stop
> occurs in "a public location such as 'the shoulder of an interstate highway, in public

view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997])(citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer." United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).  "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity."  United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the

encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205. Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words.  "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'").  For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent.  See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag.  See 173 F.3d at 765.  The officer then asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage.  See 173 F.3d at 765.  The officer did not inform the suspect that he was free to leave or not answer her questions.  See 173 F.3d at 765.  The officer asked to search the suspect's luggage and the suspect gave his consent.  See 173 F.3d at 765.  She asked him whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765. When the officer encountered the suspect's locked bag, she asked him if he could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket

and handed it to [the officer]." 173 F.3d at 766.  The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage.  See 173 F.3d at 766.  The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include.  See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances.  See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found.  United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs").  See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the

defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing Florida v. Jimeno, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

**5.  Probable Cause for Search Warrants.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant."  United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. at 239), aff'd, 749 F.3d 900 (10th Cir. 2014).  Probable cause requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d

at 1006.  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the Magistrate Judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238).  See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009).  In making his or her determination, the Magistrate Judge "may draw reasonable inferences from the material provided in the warrant application."  United States v. Rowland, 145 F.3d at 1205.

"A reviewing court should accord great deference to a magistrate's determination of probable cause . . . ."  United States v. Reed, 195 F. App'x at 822.  The court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed."  Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United States, 362 U.S. at 271).  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'"  (quoting United

States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213. Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d at 1253-54 (citing United States v. Leon, 468 U.S. 897, 914 (1984)). "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006). Specifically, the court should not defer to a Magistrate Judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

## RELEVANT LAW REGARDING THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth

Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."). The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule. See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013), aff'd, 597 F. App'x 991 (10th Cir. 2015).

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)). "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence." Utah v. Strieff, 136 S. Ct. at 2061. To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence

- 33 -

is obtained.  Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam).  The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence.  Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances."  Brown v. Illinois, 422 U.S. at 603-04.  The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine.  See 468 U.S. at 799-801, 814.  There, agents had probable cause to believe that apartment occupants were dealing cocaine.  See 468 U.S. at 799-800.  They sought a warrant.  See 468 U.S. at 799-800.  In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep.  See 468 U.S. at 800-01.  The next evening, they obtained a search warrant.  See 468 U.S. at 800-01.  The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry."  468 U.S. at 814.  The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'"  Utah v. Strieff, 136 S. Ct. at 2062 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct."  Brown v. Illinois, 422 U.S. at 604.  See Utah v. Strieff, 136 S. Ct. at 2062 (observing that the third factor is particularly significant).  The exclusionary rule exists to deter police misconduct.  See Davis v. United States, 564 U.S. 229, 236-37 (2011).  The third factor reflects this rationale by favoring exclusion "only

when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, 136 S. Ct. at 2063.  Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation."  Utah v. Strieff, 136 S. Ct. at 2063.  See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.).

    1.  **Good-Faith Exception**.

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011).  To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule."  United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)).  The Supreme Court has explained that "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue."  United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs."  United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144).  By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way."  United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).

a.      __Warrants Based on Illegally Obtained Information__.

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

b.      **United States v. Leon.**

In United States v. Leon, the Supreme Court faced the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from

which he obtained evidence.  See 468 U.S. at 905.  The Supreme Court noted that excluding this evidence would not deter police misconduct.  See 468 U.S. at 918-19.  The officer had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid.  See 468 U.S. at 918-19.  The Supreme Court explained that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court, thus, concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23.

   "The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of the evidence found is generally not warranted, so long as the officers relied in good faith on the warrant."   United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . .  "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, the Tenth Circuit has explained that, "[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of 'four contexts' appl[ies]."  United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth." [United States v. Leon, 468 U.S.] at 923 . . . . Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." *Id.* Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* (quotation omitted). Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid. *See id.*

United States v. Danhauer, 229 F.3d at 1007 (quoting United States v. Leon, 468 U.S. at 922-23).

See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If any of these situations is present, the good-faith exception should not be applied, and the evidence should be excluded."

United States v. Romero, 743 F. Supp. 2d 1281, 1316 (D.N.M. 2010)(Browning, J.).

### c.    Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama, warrant database.  See 555 U.S. at 137.  In the search incident to that arrest, officers found drugs and a gun on Herring's person.  See 555 U.S. at 137.  Herring was then indicted on federal gun- and drug-possession charges.  See 555 U.S. at 138.  It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall.  See 555 U.S. at 138.  Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it.  See 555 U.S. at 138.  The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed.  See 555 U.S. at 138.

The Supreme Court affirmed the Eleventh Circuit's affirmation of the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule.  See 555 U.S. at 140-46.  The Supreme Court agreed with the Eleventh Circuit that, although

the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. See 555 U.S. at 140. The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (quoting United States v. Leon, 468 U.S. at 922). Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring v. United States, 555 U.S. at 144. The Supreme Court further explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional." Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

### d.   Davis v. United States.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth

Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest.  See Arizona v. Gant, 556 U.S. at 341-48.  The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest.  See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996).  Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant.  United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim."  United States v. Davis, 564 U.S. at 240.  The Supreme Court explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  United States v. Davis, 564 U.S. at 240 (quoting Herring v. United States, 555 U.S. at 144).  The Supreme Court stated: "The conduct of the officers here was neither of these things.  The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence.  Nor does this case involve any 'recurring or systemic negligence' on the part of law enforcement."  United States v. Davis, 564 U.S. at 240 (quoting and citing Herring v. United States, 555 U.S. at 144).  The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case."  United States v. Davis, 564 U.S. at 240.

2.  **Inevitable-Discovery Exception.**

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"   United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444).   "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."   United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).   In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.   782 F.2d at 152.   Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."   810 F. Supp. 2d at 1274 (citations and internal quotation marks omitted).   On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question.   See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explained:

> In *Cunningham* and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."   *Cunningham*, 413 F.3d at 1204 n.1.   In Cunningham, police searched the defendant's home after getting his consent.   *Id.* at 1202.   The defendant later contested the search, claiming his consent was coerced.   *Id.*   We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred.   *Id.* at 1205.   In *Souza*, police illegally opened a UPS package that contained drugs.   223 F.3d at 1200, 1202.   We held the evidence

admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred. *Id.* at 1206. Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.

. . . .

Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] *Larsen*, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203. The Tenth Circuit stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)). Applying the first factor, the Tenth Circuit stated:

[T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this

- 42 -

case.  Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office.  Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205.  Regarding the second factor, the Tenth Circuit stated:

[A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong.  The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed.  Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06.  The Tenth Circuit noted that a sergeant eventually obtained a search warrant.  See United States v. Souza, 223 F.3d at 1206.  Regarding the third factor, the Tenth Circuit stated that, unlike "Cabassa, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued."  United States v. Souza, 223 F.3d at 1206.  The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway."  782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)).  The Tenth Circuit considered

whether contraband seized without a warrant could still be admitted under the inevitable-discovery

doctrine. See United States v. Owens, 782 F.2d at 152-53. Rejecting the United States' position

that the motel maids' routine cleaning of the defendant's room for the next occupant would have

revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth

Circuit concluded:

> Several factors suggest that motel employees performing routine cleaning may not
> have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the
> defendant's] room, they would not necessarily have opened and searched all his
> luggage and closed containers. In fact, such an intrusion would have been a
> significant invasion of his privacy. Second, even if the room had been cleared and
> the white powder inside the closed bag had been discovered by the motel staff, the
> lack of any police involvement in routine room cleanings suggests that police
> discovery of the evidence would not have been inevitable. The evidence certainly
> does not demonstrate that the [motel]'s staff would necessarily have recognized the
> powder as cocaine or have called the police if they had so recognized it. Finally,
> absent the unlawful search, [the defendant] might have posted bail on the charge of
> receiving stolen property and could have returned to his motel room before either
> the cleaning staff or the police discovered the contraband. Alternatively, a friend
> could have returned to claim the closed bag.

782 F.2d at 153. "United States v. Owens suggests that courts should be realistic, if not skeptical,

when assessing the probability that law-enforcement officers would inevitably have uncovered the

challenged evidence through an independent investigation." United States v. Martinez, 696 F.

Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery

doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the

warrant to search his house would have been issued and the incriminating evidence would have

been discovered." 413 F.3d at 1205. The Tenth Circuit, in addressing the first factor -- the extent

to which the warrant process had been completed at the time those seeking the warrant learn of the

search -- stated:

Here, the officers took substantial steps to obtain a warrant before the contested search occurred. The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes. As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately. The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204. Regarding the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Tenth Circuit stated:

The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway. The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05. Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home." 413 F.3d at 1205. Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. [United States v. Souza,

223 F.3d] at 1204.  Instead, the record indicates that the search occurred at the time
it did because of the coincidental arrival of Mrs. Cunningham.  Her presence on the
scene led to a series of events that culminated in her son's release from jail, his
return home, and his consent to search.  As a result, we are satisfied the government
has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East
76th Terrace on the evening of the search, the officers would have obtained a search
warrant and the evidence in question would have been found.  *Id.* at 1205.

United States v. Cunningham, 413 F.3d at 1205.  (citations omitted).  The Tenth Circuit, therefore,

applied the inevitable-discovery doctrine.  See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and

determined that the inevitable-discovery exception applied.  See 810 F. Supp. 2d at 1275-79.

Regarding the first factor -- the extent to which the warrant process had been completed at the time

those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any

steps to obtain a warrant before entering Christy's residence.  The United States concedes that they

did not attempt to obtain a warrant before entering Christy's residence. . . .  This factor thus weighs

against applying the inevitable discovery exception."  810 F. Supp. 2d at 1275 (citations omitted).

As to the second factor -- the strength of the showing of probable cause at the time the search

occurred -- the Court concluded:

> The Court finds that Carvo had strong probable cause that Christy
> committed crimes.  At the time of the search, Carvo believed he had probable cause
> for the California crime of unlawful sexual intercourse, because Christy and K.Y.
> exchanged naked pictures through electronic mail transmissions over the internet
> and then arranged a meeting in the middle of the night for K.Y. to run away with
> Christy.
>
> . . . .
>
>      . . . . Because Carvo knew that K.Y. and Christy were exchanging naked
> pictures, "the belief that there was a sexual relationship or sexual interest between
> the two was reasonable."  These circumstances are sufficient to form "a reasonable
> ground for belief of [Christy's] guilt," for the California crime of unlawful sexual
> intercourse.  Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted),
> for the California crime of unlawful sexual intercourse.

Carvo also had strong probable cause for the federal crime of coercion or enticement.  Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

. . . .

. . . . Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement.  Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and footnote omitted).  Regarding the third factor, -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Court held:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy.  *United States v. Cunningham*, 413 F.3d at 1205.  Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation.  Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so.  Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO or from the Albuquerque FBI.  Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information.  Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he

would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature."  If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant.  Carvo is cross designated to acquire both state and federal search warrants.  This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. at 1278-79 (second and third alterations in original)(citations omitted).  As to the fourth factor -- the existence of evidence that the officers jumped the gun, because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue."  *United States v. Cunningham*, 413 F.3d at 1205.  The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279.  Consequently, the Court applied the inevitable-discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision.  See 739 F.3d at 539-44.  Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant challenged the Court's ruling only on factors two and four -- the strength of the probable cause showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep the warrant requirement."  United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)).  Regarding the second factor -- the strength of the showing of probable cause at the time the unlawful search occurred -- the Tenth Circuit stated:

The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y. Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy. Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable. Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law. The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted). Analyzing the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit explained:

Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. Instead, the deputies forced entry because they believed K.Y. was in danger. Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted). The Tenth Circuit concluded, therefore, that the Court properly applied the United States v. Souza factors. See 739 F.3d at 542.

## ANALYSIS

The Court concludes that the Kucenski Aff. establishes probable cause and, therefore, is a sufficient basis for the Second Search Warrant. Next, the Court concludes that, even if there is not probable cause for the Second Search Warrant, Kucenski relied on the Second Search Warrant in good faith and, thus, the good-faith exception to the exclusionary rule applies. Finally, the Court concludes that, even if the Second Search Warrant lacks probable cause and the good-faith

exception does not apply, the Court will not exclude the child pornography evidence, because Kucenski inevitably would have discovered more evidence to justify a subsequent search warrant to search for child pornography during the fraud investigation.  Accordingly, the Court denies Pena's Motion to Suppress.

I.      **THE KUCENSKI AFFIDAVIT ESTABLISHES PROBABLE CAUSE, AND THUS, PROVIDES A SUFFICIENT BASIS FOR THE SECOND SEARCH WARRANT.**

Pena argues that the Court should grant the Motion to Suppress, because Kucenski's affidavit does not establish probable cause and, thus, does not provide a sufficient basis for the Second Search Warrant on which Kucenski relied to search Pena's electronic devices for evidence of child pornography.  See Motion to Suppress at 2.  Specifically, Pena argues that the Kucenski Aff. to secure the Second Search Warrant does not establish probable cause, because: (i) the Kucenski Aff. alleges that Pena possessed only "pornography," and not "child pornography," Motion to Suppress at 17; (ii) the Kucenski Aff. also relies on Pena's use of file sharing software to conclude that he possessed child pornography, see Motion to Suppress at 18; (iii) the Kucenski Aff. improperly avers that Pena's "possible collection of 'pornography' indicates a proclivity to collect 'child pornography,'" Motion to Suppress at 19; and (iv) the file folder names that the Kucenski Aff. references "do not themselves provide a reasonable basis to believe the devices contained child pornography," Motion to Suppress at 20.  In response, the United States argues that Kucenski's affidavit presents several reasons for Magistrate Judge Ritter to issue the Second Search Warrant, and, under the totality of the circumstances, the Kucenski Aff. articulates probable cause to support the warrant's issuance.  See Response at 6.  The United States contends that: (i) Pena's admission to using peer-to-peer software; (ii) Pena's failure to answer expressly "no" when asked if agents would find child pornography on his devices; (iii) "the sheer volume of

Defendant's large-capacity USB storage devices raised concerns that Defendant was engaged in collector behavior; and (iv) Kucenski's finding of file folders on Pena's devices with names such as "'hot young doll,' 'teens do porn,' 'teensx,' and 'teens obedience lesson,'" support Magistrate Judge Ritter's probable cause finding when he issued the Second Search Warrant.  Response at 6 (quoting Second Search Warrant ¶ 39, at 16-17).

In determining whether probable cause supports a search warrant, the Court looks to the totality of the circumstances, see Florida v. Harris, 568 U.S. 237, 244 (2013), to determine if, "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place," Illinois v. Gates, 462 U.S. 213, 238 (1983).  Probable cause is "'a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules.'" Florida v. Harris, 568 U.S. at 244 (quoting Illinois v. Gates, 462 U.S. at 232).  An affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  While a reviewing court "should afford a magistrate's probable cause decision great deference," it must still ensure that there is a "substantial basis for concluding that probable cause existed."  United States v. Danhauer, 229 F.3d at 1006.  Moreover, an affidavit in support of a search warrant for child pornography must provide sufficient information "such that a magistrate could independently assess whether the images meet the legal definition of child pornography."  United States v. Loera, 923 F.3d 907, 924 (10th Cir. 2019).

In arguing that probable cause does not support the Second Search Warrant, Pena relies heavily on United States v. Edwards, 813 F.3d 953 (10th Cir. 2015), in which the Tenth Circuit ruled that probable cause did not support a search warrant where a Magistrate Judge issued the

warrant "based on Mr. Edwards's possession and sharing of child erotica, the law-enforcement officer affiant's opinion that people who possess child pornography are also likely to possess child erotica, and Mr. Edwards's sexually suggestive comments about the child in the photographs." 813 F.3d at 960.   In finding that probable cause did not support the search warrant, the Tenth Circuit relied on the fact that the affiant-officer "never alleged that any of the material Mr. Edwards posted to the internet constituted child pornography" and "averred only that Mr. Edwards was known to possess legal child erotica." United States v. Edwards, 813 F.3d at 961.  The Tenth Circuit noted that "courts are reluctant to presume that persons are inclined to engage in certain illegal activity based on having engaged in a particular legal activity." United States v. Edwards, 813 F.3d at 964 (citing cases).  "[I]nnocent or legal conduct," however, "may be infused with the degree of suspicion necessary to support a finding of probable cause when examined 'through the lens of'" law enforcement officers.  United States v. Edwards, 813 F.3d at 965 (quoting United States v. Biglow, 562 F.3d 1272, 1281 (10th Cir. 2015)).  Moreover, "[n]one of the detailed descriptions contained in the affidavit described photographs conforming to the definition of child pornography also included in the affidavit." United States v. Edwards, 813 F.3d at 961.  The Tenth Circuit concluded that the affidavit relied on the fact that Edwards posted child erotica on a website, the defendant's comments suggesting a sexual attraction to the child depicted in the erotica, and the affiant-officer's conclusion that "those who possess *child pornography* are highly likely also to possess *child erotica*." United States v. Edwards, 813 F.3d at 965 (emphasis in original).  Ultimately, based on the affidavit's totality of the circumstances, the Tenth Circuit concluded that probable cause did not support the search warrant.  See United States v. Edwards, 813 F.3d at 969.

In contrast to <u>United States v. Edwards</u>, the Tenth Circuit concluded in <u>United States v. Haymond</u>, 672 F.3d 948 (10th Cir. 2012), that probable cause supported a search warrant where, during the course of an undercover investigation involving peer-to-peer software, the affiant-officer "observed a user with an IP address[7] linked to Mr. Haymond's residence who had numerous files of child pornography available for other LimeWire[8] users to access, view, and download." <u>United States v. Haymond</u>, 672 F.3d at 959. The Tenth Circuit ultimately rejected the argument that the affidavit relied on stale information given that 107 days had passed between the initial incident linking the defendant to child pornography and the affidavit in support of the search warrant, because "images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes." <u>United States v. Haymond</u>, 672 F.3d at 959 (quoting <u>United States v. Riccardi</u>, 405 F.3d 852, 861 (10th Cir. 2005)).

---

7

An IP address is a unique number identifying the location of an end-user's computer. When an end-user logs onto an internet service provider, they are assigned a unique IP number that will be used for that entire session. Only one computer can use a particular IP address at any specific date and time.

<u>United States v. Haymond</u>, 672 F.3d 951 n.2 (quoting <u>United States v. Renigar</u>, 613 F.3d 990, 992 n. 2 (10th Cir. 2010)).

[8]LimeWire is a

peer-to-peer file sharing program that allows users to trade computer files over the Internet.[] When a user launches LimeWire and inputs a search term, the program seeks to match the term in the names of files that other users have designated for sharing. LimeWire then returns a list of available files containing that term, which the user may select and download.

<u>United States v. Haymond</u>, 672 F.3d at 950 (footnote omitted).

Two subsequent cases, see United States v. Loera, 923 F.3d 907 (10th Cir. 2019), and United States v. Kilgore, 856 F. App'x 783 (10th Cir. 2021)(unpublished), followed United States v. Haymond and United States v. Edwards.  In United States v. Loera, the Tenth Circuit held that the officers' search of four CDs in the course of a computer fraud investigation violated the Fourth Amendment when the officer opened an image on the disk "specifically '[t]o write a description of an image on the disc'" so that he could "'obtain a second warrant for child pornography,'" because it demonstrated the officer was searching improperly for evidence of child pornography on the discs.  United States v. Loera, 923 F.3d at 922 (quoting Record on Appeal ("ROA") Vol. II at 72).  After considering the veracity of the affidavit in support of the second search warrant's issuance without the improperly obtained evidence, the Tenth Circuit concluded that "Agent Cravens' remaining statement that the CDs 'appeared to contain images of child pornography' provides no detailed description of what the images depicted such that a magistrate could independently assess whether the images meet the legal definition of pornography."  United States v. Loera, 923 F.3d at 924 (quoting ROA Vol. 1 at 120).  In United States v. Kilgore, the Tenth Circuit concluded that the affidavit contained sufficient information to support a search warrant, because

> the affidavit specified that IP addresses assigned to Mr. Kilgore[] had been linked to images of child exploitation, identified him as a convicted sex offender (child pornography),[9] and stated that he was currently registered at a new address in

---

[9]The Tenth Circuit's footnote 4 states:

Mr. Kilgore contends the affidavit lacked information which would establish whether the prior conviction was stale. But our caselaw counters the argument that an undated conviction for possession of child pornography cannot be used to support a search warrant for child pornography. See United States v. Perrine, 518 F.3d 1196, 1205-06 (10th Cir. 2008)(citing cases).

United States v. Kilgore, 856 F. App'x at 785 n. 4.

Rogers County which was the subject of the warrant.  When considered together these facts established probable cause for the warrant.

United States v. Kilgore, 856 F. App'x at 785 (footnote in original).

The United States contends that Pena's case is distinguishable from each of the preceding Tenth Circuit cases.  Notably, the United States contends that, unlike the search warrant in United States v. Edwards, the search warrant in Pena's case expanded the scope of the search -- but only within the devices already in Kucenski's possession -- and did not grant an initial physical entry to a residence.  Response at 7.  Moreover, the United States argues that this case is distinguishable from United States v. Edwards, because the Kucenski Aff. mentions file folders with explicit references to "sex" and "teen" "in tandem with Pena's use of peer-to-peer software, Defendant's equivocation, and the large number of external hard drives."  Response at 8.  Further, the United States notes that this case is distinguishable from United States v. Loera in an important way: in United States v. Loera, a law enforcement officer re-opened a file containing child pornography to obtain a file description for the affidavit in support of a second search warrant; here, when Kucenski found file folders that he believed indicated child pornography's presence, he halted his search and sought the Second Search Warrant.  See Response at 8.

The Court concludes that the Kucenski Aff. establishes probable cause, and thus, supports Magistrate Judge Ritter's issuance of the Second Search Warrant.  While the Court should not rely solely on a suspect's engagement in legal activity to presume that a suspect has engaged in illegal activity, the Court may consider legal conduct in conjunction with suspicion when determining if the totality of the circumstances indicates a fair probability that a suspect has engaged in illegal activity.  See United States v. Edwards, 813 F.3d at 965 (concluding that "innocent or legal conduct may be infused with the degree of suspicion necessary to support a finding of probable cause when

examined 'through the lens of'" law enforcement officers (quoting United States v. Biglow, 562

F.3d 1272, 1281 (10th Cir. 2015)).  See also United States v. Loera, 813 F.3d at 963 (concluding

that the defendant's possession and publication of child erotica, which is legal activity, did not

establish probable cause that the defendant possessed child pornography).  The Kucenski Aff.

relies, in part, on Pena's acknowledged possession of pornography.  Officers relayed Pena's

statement that the electronic devices would contain "family photos" and "porn" to Kucenski before

he began his forensic investigation of the electronic devices for computer fraud, and he included

that information in the Kucenski Aff.  See Tr. at 19:14-15 (stating that "my understanding was that

Mr. Pena explained that there were family photos and pornography" on the devices officers

seized)(Kucenski); Kucenski Aff. ¶ 38, at 16.  Although Pena avers that Kucenski relies only on

Pena's legal pornography possession, Kucenski also relies on the incriminating file folder labels,

Pena's use of peer-to-peer software, and Pena's "collector behavior."  Kucenski Aff. ¶ 24, at 14.

First, the Court concludes that the file folder names Kucenski observed, "'HotYoungDoll' (sic),

'HotYoungThing' (sic), 'hotyoungthing-nude_xvid.avi' (sic), 'Casting Couch Teens Site Rip',

'Teens Do Porn SiteRip', 'teensx' (sic), 'DblTemedTens' (sic)[10], 'Teens Obedience Lesson Site

Rip', and 'Teen Sex Mania SiteRip' (sic)," Kucenski Aff., at 16-17 (alteration in Kucenski Aff.),

indicate child pornography.  The word "teen" indicates a person aged between thirteen and

nineteen.  Tr. at 92:23-24 ("In general nomenclature yes, teen would include 13-19.")(Chase).

---

[10]With the file name "DblTemedTens" in particular, the Court is unsure why Kucenski
included the notation "sic."  The Court believes that this file name may indicate pornography
involving ten-year-old children, and if so, this file name strongly indicates the presence of child
pornography.  See, e.g., United States v. Loera, 923 F.3d at 929 (noting that a file labeled "Spycam
9yr Undress" suggested the presence of child pornography); United States v. Haymond, 672 F.3d
948, 950 (10th Cir. 2012)(nothing that "'8yo'" is an acronym for "'8 year old' which is associated
with child pornography.")

While it is possible that the word "teen" implies pornography involving legal adults, it is more likely that the word "teen" indicates pornography involving a minor child aged thirteen through seventeen.  There are more minor teens than adult teens.  While Pena places much weight on the fact that the Kucenski Aff. states only that the file folder names "suggest the contents of pornography," Kucenski Aff. ¶ 39, at 16-17, the Court's inquiry centers on whether Kucenski provided sufficient information in the affidavit to allow a Magistrate Judge to independently assess whether the devices would likely contain child pornography.  See United States v. Loera, 923 F.3d at 924.  Thus, that Kucenski acknowledged that he was not sure that the file folder names indicated child pornography is not dispositive in the probable cause analysis.  See Tr. at 69:7-13 (Dodd, Kucenski).  Certainty is not required; only probable cause is required.  See Stonecipher v. Valles, 759 F.3d 1134, at 1141 ("Probable cause is a matter of probabilities and common sense conclusions, not certainties.").  In making a probable cause determination, a Magistrate Judge may rely on the statements of an affiant-officer but, ultimately, the Magistrate Judge must come to an independent conclusion that there exists "a fair probability that contraband or evidence" of child pornography "will be found in a particular place."  Illinois v. Gates, 462 U.S. at 238.

Further, the other indications of child pornography on which Kucenski relied support probable cause for the search warrant when considered within the totality of the circumstances. Namely, the United States argues Pena's use of peer-to-peer software, Pena's so-called equivocation about whether he possessed child pornography, and the volume of electronic devices Pena owned provide a sufficient basis for a probable cause determination.  In the Kucenski Aff., Kucenski states that, based on his experience and expertise, those who use peer-to-peer software often possess child pornography.  See Kucenski Aff. ¶ 6, at 3 ("Your Affiant knows that 'peer-to-peer' (P2P) networks are often used to obtain and share child pornography." (no citation for

quotation provided)).  Moreover, Kucenski averred that Pena's use of numerous hard drives and devices is indicative of "collector behavior" common among those who possess child pornography. Kucenski Aff. ¶ 24, at 14.  Magistrate Judge Ritter was entitled to rely on Kucenski's expertise in determining that those who possess child pornography often use multiple devices and use peer-to-peer file sharing software, because Kucenski also set out specific facts explaining why those who possess child pornography have many devices and use file sharing software.  See Poolaw v. Marcantel, 565 F.3d 721, 732 n. 10 (10th Cir. 2009)(noting that "[f]or an officer's experience and training to support a finding of probable cause, the affidavit must set out facts explaining why, based on this experience and training, there was reason to believe" that contraband would be found).  The United States further relies on Pena's answer to officers asking him if there was any child pornography on his computers, characterizing it as an "equivocation."  The Court is not persuaded that Pena's answer, "No," to the question whether he possessed child pornography constitutes an equivocation.  Kucenski Aff. ¶ 38, at 16.  Pena did not equivocate, but his response raises suspicion.  His caveat to the answer "No." -- that he "rips" pornography from "torrent" files -- suggests to the hearer that he knew that his computer contained child pornography and was moving towards an explanation.  Kucenski Aff. ¶ 38, at 16.  His mind jumped to a defense, mentally and subconsciously conceding -- despite his verbal denial -- that the computer contained child pornography.  Additionally, Pena immediately conceded to officers that his devices contained "porn," Aff. ¶ 38, at 16, indicating that he was concerned at the outset for what the officers might find.  The Court is persuaded, therefore, that Pena's statements, in conjunction with Kucenski's declarations that those who possess child pornography often use torrent files and peer-to-peer software, supports sufficiently a probable cause finding.  Kucenski Aff. ¶ 38, at 16.

Consequently, the Court concludes that the Kucenski Aff. establishes probable cause, and thus, provides a sufficient basis for the Second Search Warrant.

Pena's defense counsel has worked hard to take each of the United States' and Kucenski's grounds for probable cause -- the file names, Pena's use of peer-to-peer software, Pena's equivocation, and the number of electronic devices Pena owned -- one at time.  Counsel arguing that each of these grounds is alone insufficient to support probable cause, however, is not the way that probable cause analysis works.  See D.C. v. Wesby, 138 S. Ct. 577, 588 (2018)(rejecting the lower court's probable cause analysis where the court analyzed each fact individually to determine if it supported probable cause).  The Anglo-American jurisprudence on probable cause is not an academic exercise; it is a profoundly practical one.  See Illinois v. Gates, 462 U.S. at 214 (emphasizing that determining probable cause is a "practical, common-sense" task).  The Court may and should consider the totality of the factors.  See D.C. v. Wesby, 138 S. Ct. at 588 (holding that "the whole is often greater than the sum of its parts -- especially when the parts are viewed in isolation.").  The Court is reluctant to adopt a rule that a suspect's careful labeling of folders means that there cannot be probable cause.  Instead, the Court must look to the entire context -- here, the file names in conjunction with Pena's peer-to-peer software use, his statements to officers, and the large number of devices he possessed -- to determine whether there is a fair probability that officers will find contraband.  Here, the Court concludes that the totality of the circumstances indicate that child pornography would be found on Pena's devices and, consequently, the Court concludes that the Kucenski Aff. supports Magistrate Judge Ritter's probable cause determination.

## II.    KUCENSKI RELIED ON THE SEARCH WARRANT IN GOOD FAITH.

Pena contends that the exclusionary rule's good faith exception does not apply, because "the warrant affidavit is completely devoid of credible facts indicating the devices contained child

pornography." Motion to Suppress at 21. In response, the United States argues that, even if probable cause does not support the Second Search Warrant, the Court should apply the good-faith exception, because Kucenski relied on Magistrate Judge Ritter's determination of probable cause in conducting the search for child pornography. Response at 10. Pena replies, contending that the good faith exception should not apply, because the Kucenski Aff. solely relies on a suspicion of pornography, not child pornography, and the Kucenski Aff. otherwise lacks probable cause to support the Second Search Warrant's issuance. See Defendant's Reply in Support of his Motion to Suppress Evidence at 2-3, filed September 3, 2021 (Doc. 42)("Reply").

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the United States will generally be prohibited from using that evidence in a criminal prosecution of that person. See Sanchez-Llamas v. Oregon, 548 U.S. at 332-33. The exclusionary rule applies if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres-Castro, 470 F.3d at 999. Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies. See United States v. Torres-Castro, 470 F.3d at 999. Recognizing that the exclusionary rule's "sole purpose" "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. at 236-37. To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule." United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. 897, 907 (1984)).

In United States v. Loera, the Tenth Circuit concluded that the good-faith exception to the exclusionary rule did not apply, because "the illegality at issue" in the application for the search warrant "stems from unlawful police conduct, rather than magistrate error, and therefore the deterrence purposes of the Fourth Amendment are best served by applying the exclusionary rule." United States v. Loera, 923 F.3d at 925 (emphasis in original). The Tenth Circuit's focus in United States v. Loera was on whether the error in a probable cause determination was attributable to police officer misconduct or the Magistrate Judge's error in judgment. See 923 F.3d at 925-26. Because the exclusionary rule is meant to deter police officers from violating suspects' Fourth Amendment rights, the Supreme Court has noted that "[p]enalizing the officer for the magistrate's error rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." United States v. Leon, 468 U.S. 897, 921. The Tenth Circuit has held that a court should "presume good faith when an officer acts pursuant to a warrant unless one of four contexts appl[ies]." United States v. Barajas, 710 F.3d at 1110.

"Under the good-faith exception to the exclusionary rule, '[i]f a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate.'" United States v. Augustine, 742 F.3d 1258, 1262 (10th Cir. 2014)(quoting United States v. Campbell, 603 F.3d 1218, 1225 (10th Cir.2010)(alteration in United States v. Augustine)). A law enforcement officer is presumed to act in good faith when he relies on and executes a search warrant, because "'[i]t is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination." United States v. Edwards, 813 F.3d at 971 (quoting Malley v. Briggs, 475 U.S. 335, 346 n. 9 (1986)(alteration in United States v. Edwards)). "[P]olice officers should be entitled to rely upon the probable-cause

determination of a neutral magistrate when defending an attack on their good faith for either seeking or executing a warrant." United States v. Tuter, 240 F.3d 1292 (10th Cir. 2001)(quoting United States v. Corral-Corral, 899 F.2d 927, 939 (10th Cir.1990)).   "The question . . . is not whether the Magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued.  It is instead whether the Magistrate so obviously erred that any reasonable officer would have recognized the error."  Messerschmidt v. Millender, 565 U.S. 535, 556 (2012). Moreover, the Supreme Court has identified four scenarios in United States v. Leon in which suppression is the proper remedy for a search warrant's improper issuance:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth."  Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role."  Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000)(quoting United States v. Leon, 468 U.S. at 922).

Pena argues that the search warrant is so devoid of factual allegations to establish a nexus between Pena and child pornography that Kucenski could not reasonably believe it was valid.  See Motion to Suppress at 21.  The Court concludes, however, that Magistrate Judge Ritter's probable cause determination is not obviously so unreasonable that Kucenski should have recognized the error.  See United States v. Edwards, 813 F.3d at 972 ("Although the link between Mr. Edwards's postings and the possession of pornography was logically fallacious, it is not so obviously unsound that it rendered reliance on the warrant objectively unreasonable.").  See also United States v. Corral-Corral, 899 F.2d 927, 934 (10th Cir. 1990)(holding that, although the agent's "affidavit was

not a model of specificity, we do not believe it was so lacking in probable cause as to render official belief in its existence entirely unreasonable"). Moreover, there is no allegation that Kucenski acted improperly in his initial search pursuant to the First Search Warrant. Kucenski acted in contrast to the officer in <u>United States v. Loera</u>, who improperly opened images of child pornography to write a detailed search warrant, by pausing his search and filing the Kucenski Aff. in support of the Second Search Warrant. <u>See</u> 923 F.3d at 924. Therefore, applying the exclusionary rule in this case does not serve the exclusionary rule's purpose -- deterrence of Fourth Amendment violations by law enforcement officers. Because the Court concludes that Kucenski acted in good faith by relying on the Second Search Warrant, the exclusionary rule does not apply.

## III.   KUCENSKI   WOULD   HAVE   INEVITABLY   DISCOVERED   CHILD PORNOGRAPHY.

Pena contends that Kucenski would not have inevitably discovered the child pornography during his fraud investigation. <u>See</u> Motion to Suppress at 24. Pena argues that, "[i]n light of the vast volume of data on the devices, the government conducted the search by using keywords" related to the fraud investigation to identify relevant documents, and the reviewing agent would not have "randomly opened and reviewed any image or video files." Motion to Suppress at 24-25. Moreover, Pena relies on Chase's testimony to contend that, "given the scope of the original warrant and the type of crime being investigated, there would be no reason to review the image and video files on the digital devices." Motion to Suppress at 25 (quoting Sworn Declaration of Brian Chase ¶¶ 11-16, at 4-5 (dated August 6, 2021), filed August 26, 2021 (Doc. 29-2)("Chase Decl."). Further, Pena relies on Chase's statement that Kucenski would not search manually for evidence of fraud, but would instead employ search terms related to fraud, and thus, the probability of Kucenski encountering child pornography was low. <u>See</u> Motion to Suppress at 25 (citing Chase

Decl. ¶¶ 11-16, at 4-5).  Finally, Pena relies on Chase's opinion that the use of the specialized software, Griffeye, "was necessary for the government to find what they describe as the roughly 1% of files constituting child pornography," and, even using such a method, Kucenski's report states that it only processed approximately 3.75% of the files on Pena's devices.  Motion to Suppress (quoting Chase Decl. ¶¶ 7-8, at 2-3).

The United States, on the other hand, contends that the exclusionary rule should not apply, because Kucenski would have discovered inevitably child pornography.  See Response at 14.  The United States first argues that Kucenski would have continued searching the devices pursuant to the fraud warrant and, thus, "it is exceedingly likely that his random review process would have led to the observation of additional file titles, leading to a search warrant."  Response at 15. Second, the United States contends that Kucenski would have observed additional file titles when he was "walking the scene" to understand the device's layout and materials.  Response at 15. Third, the United States notes that the First Search Warrant allowed Kucenski to search Pena's browsing history, which would have revealed the search terms "'Teen casting', 'teens', 'schoolgirls', 'Banging the Young', 'boysfuckteens', 'ClubSevenTeen', 'Jailbait Girls', and 'lola'."  Response at 16 (quoting Possible Child-Related Internet Artifacts Summary Report, filed August 20, 2021 (Doc. 32-3)("Internet Artifacts Report")).

Pena replies and disputes the reliability of the Internet Artifacts Report on which the United States relies.  See Reply at 11.  Pena argues that the Internet Artifacts Report was "generated by searching Internet Evidence Finder (IEF) reports for evidence relating to child pornography." Reply at 11.  Further, Pena argues that the "IEF reports are comprised of hundreds of thousands of rows of data, from which the agent, while specifically looking for evidence relating to child pornography, identified only a tiny fraction that could possibly relate to child pornography."  Reply

at 11.  Pena emphasizes that "there was a very low probability" that Kucenski would have discovered child pornography "by randomly clicking on images or videos or scrolling through internet history because of the vast volume of data."  Reply at 11-12.

Under the inevitable discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  For the inevitable discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  United States v. Owens, 782 F.2d at 152.  "'[W]hat makes a discovery 'inevitable' is not probable cause alone . . . but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search.'"  United States v. Souza, 223 F.3d 1197, 1204 (10th Cir. 2000)(quoting United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995)(alteration in original)).  "[A] court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means."  United States v. Souza, 223 F.3d at 1205.  In United States v. Loera, the Tenth Circuit determined that agents would have discovered inevitably child pornography during an investigation for computer fraud.  See 923 F.3d at 928.  The Tenth Circuit concluded that, because the agent testified that he would have searched the electronic folders where he ultimately discovered child pornography, and at least one folder he would have lawfully opened contained a file called "Spycam 9yr Undress", the inevitable discovery doctrine applied.  See 923 F.3d at 928-29.

The Court concludes that Kucenski would have discovered inevitably child pornography on Pena's devices. Pena argues that the probability of Kucenski finding child pornography during his computer fraud investigation was exceedingly low, because of the vast numbers of files on Pena's devices. Pena's expert witness, Chase, testified that he found child pornography while conducting a manual search -- that is, a search without the assistance of a program. See Tr. at 94:20-95:3 (White, Chase). While Chase acknowledged that it was possible to discover child pornography during a manual search, Chase also testified that, to find an image of child pornography on Pena's computer, an agent "would have to be specifically clicking through images contained within folders that are clearly not related to any sort of procurement fraud." Tr. at 96:13-16 (Chase). Moreover, in his nearly year-long investigation of Pena's devices, Kucenski searched merely 3.75% of Pena's files and concluded that only one percent of those files potentially contained illegal child pornography. See Forensic Analysis at 7. Unlike United States v. Loera, where the agent testified that at least one folder he would have lawfully opened contained an incriminating file, here, Chase avers that the child pornography was not in the same location as evidence of fraud on Pena's devices. In fact, Kucenski testified that most of the child pornography was found on hard drive 4 and hard drive 7, and that he did not search hard drives 4 and 7 in connection with the fraud investigation, because the high-level review of the two hard drives indicated that they contained "only pornography." Tr. at 68:1-17 (Dodd, Kucenski). While the United States relies on the IEF to contend that Pena's browsing history -- which Kucenski could permissibly access pursuant to the First Search Warrant -- indicated Pena had child pornography, Chase testified that there were hundreds of thousands of items in the IEF and that the United States' exhibit lists only about 200 entries. See Tr. at 89:16-25 (Dodd, Chase). This fact implies an exceedingly low probability that Kucenski would have searched manually Pena's browsing history

rather than using search terms targeted at the fraud investigation.  Accordingly, the Court cannot say with a high level of confidence that Kucenski would have found evidence of child pornography absent the Second Search Warrant.

The Court concludes, however, that if Kucenski had continued the fraud investigation, he would have uncovered additional evidence to support the Second Search Warrant's issuance. Kucenski testified that, even if he had not paused his search to apply for a search warrant, he believed he would have discovered child pornography in the course of the fraud investigation because, "[a]t least in a couple of cases, the files were found at a pretty high level in the directory structure [of] the device, so it was only a folder or two down where other key word[s] started coming out that would suggest that something may be there." Tr. at 32:22-34:1 (Kucenski).  Thus, as the United States argues, Kucenski would have found more incriminating file folder names while he was "walking the scene" of the devices' contents, and this discovery would have supported probable cause for a search warrant.   If Kucenski had not paused his search to obtain the Second Search Warrant, it is highly likely that he would have encountered more incriminating file folder names that indicated child pornography's presence, thus supporting probable cause for a search warrant.  Consequently, the Court concludes that the child pornography on Pena's devices would have been discovered inevitably in the course of Kucenski's investigation.

**IT IS ORDERED** that the Defendant's Motion to Suppress Evidence, filed August 6, 2021 (Doc. 29), is denied.

_____
UNITED STATES DISTRICT JUDGE

- 67 -

*Counsel*:

Fred J. Federici
  Acting United States Attorney
Sarah Jane Mease
Stephen A. White
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Vincent J. Ward
Christopher A. Dodd
Shammara H. Henderson
Freedman Boyd Hollander Goldberg Urias & Ward, P.A.
Albuquerque, New Mexico

*Attorneys for the Defendant*